ST. LOUIS, B. & M. RY. CO. v. ROBERTS.*
(No. 7222.)

(Court of Civil Appeals of Texas. Galveston. Oct. 31, 1916.)

1. CONTRACTS ⬤⟶247—MODIFICATION—SUFFICIENCY OF EVIDENCE.

In an action for the contract price for digging a well, evidence *held* to show that the contract as modified by parol required plaintiff to procure water of a quality equal to that from another well in the same town.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1139, 1787; Dec. Dig. ⬤⟶247.]

2. CONTRACTS ⬤⟶322(3)—ACTIONS—SUFFICIENCY OF EVIDENCE.

In an action for the contract price for digging a well, evidence *held* to show that the water from the well dug by plaintiff was not equal in quality to that of another well, as required by the contract.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1534; Dec. Dig. ⬤⟶322(3).]

3. CONTRACTS ⬤⟶304(1) — PERFORMANCE — ACCEPTANCE.

Where the well dug by plaintiff under contract with defendant failed to produce the quality of water called for by the contract, plaintiff is not entitled to recover the contract price therefor, unless the well was accepted by defendant as being in full compliance with the contract.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1457; Dec. Dig. ⬤⟶304(1).]

4. CONTRACTS ⬤⟶304(2) — PERFORMANCE — ACCEPTANCE.

A direction by defendant to plaintiff to remove his well-digging apparatus to another locality, on being informed that the well in question was producing the quantity of water required by the contract, is insufficient to show an acceptance of the well as full compliance with the contract as to the quality of water, where plaintiff could not have produced better water by continuing his well-digging operations further.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1458–1464; Dec. Dig. ⬤⟶304(2).]

Appeal from District Court, Harris County; Wm. Masterson, Judge.

Action by John E. Roberts against the St. Louis, Brownsville & Mexico Railway Company. From a judgment for plaintiff, defendant appeals. Reversed and rendered.

Andrews, Streetman, Burns & Logue, R. C. Fulbright, and W. L. Cook, all of Houston, for appellant. Meek & Kahn, of Houston, for appellee.

McMEANS, J. John E. Roberts brought this suit against the St. Louis, Brownsville & Mexico Railway Company and Frank Andrews, as its receiver, to recover $5,586, with interest, alleging that said sum was the contract price which defendants agreed to pay him for drilling two wells, one at Sinton, and the other at Robstown.

Upon the trial of the case the plaintiff voluntarily dismissed his suit as against the receiver, and the court peremptorily instructed the jury to return a verdict for the defendant railway company for the claimed contract price of drilling a well at Robstown, and submitted special issues to plaintiff's claim for drilling the well at Sinton, and upon the answers of the jury to such special issues, the court entered judgment for plaintiff in the sum of $2,802, with interest from May 1, 1913, from which the defendant has appealed.

When the introduction of the evidence had been concluded the defendant requested the court to peremptorily instruct the jury to return a verdict for it as against the plaintiff's claim for drilling the well at Sinton; and several of appellant's assignments of error are predicated upon the refusal of the court to instruct the jury as requested.

Appellant's main contention in substance is that as plaintiff's cause of action is predicated upon a contract, it is essential to entitle him to recover that he bring evidence at least tending to show a performance on his part of the provisions of the contract before he can exact performance from the defendant, and that as there is no evidence whatsoever that plaintiff performed the Sinton contract with respect to the quality of the water called for, he cannot recover.

The contract declared upon by plaintiff was in writing. In the first paragraph it is provided the manner in which the well should be sunk and finished. The second paragraph is as follows:

"The contractor agrees to sink two 8-inch tubular wells to a depth of not less than 120 feet, or to such a depth as may be necessary and proper to develop the best supply of water, provided that said wells shall not be drilled more than 850 feet in depth, and in the event said wells do not develop 100,000 gallons of fresh water per day upon reasonable and proper test, then the said contractor agrees to bore or sink a third tubular 8-inch well to a similar depth, and hereby guarantees to said company an annual supply of fresh water from said three wells, equalling not less than 100,000 gallons per diem of 24 hours, and in the event said three wells do not furnish upon reasonable and proper test a supply equalling 100,000 gallons per diem of 24 hours as per this guaranty, the said contractor further agrees to continue with the drilling of said third well and sink same to what is commonly known as the '700-foot stratum,' or to a depth not to exceed 850 feet, and said contractor guarantees to said company an annual supply of fresh water from said deeper well equalling not less than 100,000 gallons per diem of 24 hours; and in the event said deeper well does not develop upon reasonable and proper test a supply of water as herein guaranteed, no compensation will be required by the said contractor of and from the company for labor performed or materials furnished in the development of any of said wells, save and except transportation for four men and materials and tools as herein provided for from Danbury or Blessing to Odem and return from Odem to Houston. * * *"

The fifth paragraph provides for tests as to the producing capacity of the well, and the

seventh provides the amount of plaintiff's compensation for doing the work and the time of payment. The contract was signed on behalf of the defendant by J. S. Pyeatt, its vice president, who acted for it in making the contract.

[1] Before plaintiff had done anything toward drilling the well at Odem the contract was changed so as to apply at Sinton instead of at Odem. After the drilling of the well at Sinton had begun plaintiff noticed for the first time that the contract called for fresh water. Upon making this discovery plaintiff called upon Mr. Pyeatt, and called his attention to the stipulation for fresh water, and informed him that fresh water could not be obtained in that locality, whereupon the contract in that regard was modified, and as showing the extent of modification we must resort largely to the language of the persons who testified in respect thereto. Plaintiff testified that after he told Mr. Pyeatt that fresh water could not be obtained in that locality, as none was there, further testified:

"Well, Mr. Pyeatt said, 'You will have to go to the courthouse strata and get that water, and that will be satisfactory with us; we know it is not fresh water, but it will be satisfactory with us.' That is what is called the 940-foot strata."

Further on he testified:

"The contract which has been introduced in evidence here calls for fresh water, and, as I have testified, I went to Mr. Pyeatt about that particular matter, and we had a conversation about it, and I told Mr. Pyeatt that I did not understand it, and he knew it too. My understanding of the matter at the time I discussed the matter with Mr. Pyeatt was, that we were to get the courthouse water. I considered fresh water to mean water like we get here in Houston and around here and as far down as Collegeport. You do get good fresh water down as far as Collegeport. I explained to Mr. Pyeatt, according to my testimony already given here, that I couldn't get that water down at Sinton, and he agreed then to modify it so as not to bind me to fresh water, and as to the quality of water to be produced, it was to be the same as the courthouse well at Sinton, and they are about three blocks apart. So that it was understood that the requirement as to quality, in the contract, should be changed from fresh water to water the same quality as the courthouse well at Sinton; therefore we changed the depth from 850 feet to 940 feet; that was not after we had made the change as to depth; they made the change then—that is, they made the change at the same time. In other words, I was to produce water as good in quality as the courthouse well at Sinton. When the quality of water was mentioned at any time in these negotiations between Mr. Pyeatt and I, or any other representative of the company, I knew that the quality had reference to boiler purposes."

Upon the same subject the witness Pyeatt, defendant's vice president, testified:

"In the negotiations leading up to the contracts for the drilling of those other wells and for the drilling of these particular wells, I in person discussed the matters with Mr. Roberts. In reaching conclusions about the drilling of wells with reference to the material points in it, that is, as to how about the local conditions down there, etc., I left it entirely with Mr. Roberts; that is, as to the depth that he would go to get the water that we were seeking for the purpose for which we wished to use it. I did tell Mr. Roberts the kind of water we were seeking. In talking to Mr. Roberts about it, I was talking to him as a man familiar with the different strata down there, and familiar with the probabilities of securing a given water at a given depth, for he assured me that he was familiar with it, and I relied more on his judgment than on any information that we had about the sort of water in the different strata. It was understood that the water was to be used for a definite and specific purpose; it was understood that the water was required for locomotive purposes.

"I executed the Sinton well contract and the Robstown well contract, on behalf of the defendant railway company, jointly with Mr. Roberts, the plaintiff in this case. I recall the fresh water terminology in those contracts. I also recall a conversation I had with Mr. Roberts subsequent to the execution of the Sinton contract relating to the fresh water terminology in that contract. I had a conversation with Mr. Roberts in regard to fresh water with reference to both the Sinton and Robstown contracts, but not at the same time; the conversation about the Sinton contract was prior to the other, and, with reference to that, Mr. Roberts wanted to know what we meant by 'fresh water,' whether it was absolutely pure water, or whether it meant water fit for steaming purposes in a locomotive boiler; I told him that we didn't expect better water than had been obtained in that locality, or water that we had no right to expect in that locality, that we had tested the Sinton deep well water before we decided to put a well at Sinton, and knew that we could use it in our locomotive boilers, that we knew the depth of that well, and that we would accept water equal to the Sinton well water, and we would accept that as fresh water and as a complete fulfillment of the contract so far as the quality of the water was concerned, and he said that was entirely satisfactory. The Sinton courthouse deep well was mentioned in that conversation for the standard for test, and the comparison was ultimately reached by analysis."

We think that but one conclusion can be drawn from the foregoing testimony, and that is, that under the contract as modified the plaintiff contracted and agreed to produce a supply of water of quality equal to the courthouse well at Sinton.

[2] There is no question that in the manner of sinking and finishing the well and the depth to which it was sunk the plaintiff complied with the contract. Also there is no question that the well after its completion produced the quantity of water called for in the contract, viz., 100,000 gallons in each 24 hours. The decision of this case, therefore, hinges largely upon the question of whether the water obtained from it was of equal quality to that of the courthouse well at Sinton. The well in question was sunk about 1,000 feet distant from the courthouse well. In the drilling operations water from a nearby well, producing salt water, was used in great quantities; the salt water being pumped into the well in the course of drilling. The well after it was completed produced by natural flow about 3,500 gallons per day. A suction pump was used for several days to increase the flow, and thereafter an air compressor was used, and by its use the flow was increased until it amounted to more per day than called for in the con-

tract. The well was completed about March 28, 1913. On the 24th of April, 1913, a sample was obtained for analysis, and turned over to P. S. Tilson, a chemist. Afterwards, about June 9, 1913, another sample taken from the well was also turned over to Mr. Tilson for the same purpose. It is undisputed that from the time of its completion to the time of taking the samples the well had a continuous natural flow of about 3,500 gallons per day, and that the well had not only been pumped to develop its greatest capacity, but that for the 24 hours preceding the taking of the samples for analysis the well had been pumped. It is hardly conceivable, therefore, that any of the salt water pumped into the well during drilling operations still remained in it at the time the last sample was procured for analysis. According to the testimony of the chemist, Tilson, the samples showed the water to be salty and wholly unfit for use in locomotive boilers, and was not of the same quality as the courthouse well. The analysis of the samples showed the presence respectively of 342.115 and 354.771 grains of sodium chloride or common salt in each gallon, while samples taken from the courthouse well on August 5, 1912, and May 31, 1913, respectively, showed the presence of only 69.608 and 76.914 grains of sodium chloride per gallon. In this connection the plaintiff testified:

"Water was taken from that well I drilled at Sinton for the purpose of a test; they finally took some to analyze it. I think my men shipped a jug of it to Houston for the railroad company, or Mr. Heyser did. * * * We kept the pump on the well for a couple of days, and pumped water; I guess you would call it salty water. * * * I did know that there was salt stratum underneath there; I knew all the time we were pumping there that I was pumping out salt water of the same grade as that salt stratum. I knew that it was not the same grade of water as would be accepted by the company; it was not as good as the courthouse water at that time."

He further testified:

"I knew, of course, that if I didn't get the quality of water at that depth that I couldn't perform the contract, because I couldn't go deeper; so that if you take it the way you put it, that is, in so far as the depth was concerned and everything, if I didn't in fact get the water at that depth (934 feet) the contract absolutely fell, I guess it is right."

It was shown that while the water in the courthouse well was not good for use in locomotive boilers, still it could be so used, while according to the testimony of the witness Tilson the water in the well drilled by plaintiff was four times as bad as that in the courthouse well, and wholly unfit for such use.

The witness Pyeatt testified that after he received the chemist's report of the water first taken from the well, he rejected the well; that he personally advised the plaintiff and showed him the report upon the difference between the quality of the water in the courthouse well and the new well. He testified in that connection:

"In that conversation Mr. Roberts said they had used salt water out of the ice company's well across the track to wash that well, and he believed that a good deal of that water still remained in the well possibly when we got this sample, and asked us to wait for two or three weeks and take another sample and have it analyzed; I told him we would wait as long as they asked us to, and take the sample of it. We took the sample— I don't know just how long, but some time after —and had it analyzed, and it showed practically no change."

The chemist's report on the first sample was dated April 28, 1913, and his report on the second was dated June 9, 1913.

[3] The foregoing testimony, which is without dispute, conclusively shows, we think, that the water from the well in question was not of the quality of that in the courthouse well, but was greatly inferior and wholly unfit for use in locomotive boilers; and that while the plaintiff complied with his contract as to the quantity of daily production, he wholly failed to comply with his agreement to produce the quality of water called for in the contract. This being true plaintiff was not entitled to recover unless the defendant received the well and accepted the same as being in full compliance by plaintiff with his contract as to the quality of the water produced; and as to this question we now direct our inquiry.

[4] Special issue No. 2, submitted by the court to the jury, is as follows:

"Did the defendant's general water superintendent, E. B. Brown, accept said well from the plaintiff?"

This question was answered in the affirmative. Appellant by its sixth assignment of error asserts that there is no evidence in the record from which the jury could have answered this special issue in the affirmative. The material testimony introduced upon this issue is substantially as follows:

Plaintiff testified:

"After we got the amount of water that I have just testified about, I waited two or three days for Mr. Brown to come and accept the well, and Mr. Heyser telegraphed that the well was finished and ready to be accepted, and Mr. Brown finally came, and we met him at the train, but he wouldn't get off the train; he was sitting on the back of the train; and he asked Mr. Heyser about the well, and Mr. Heyser told him the well was finished and producing over 100,000 gallons of water per day, and that he had measured the depth, etc., and Mr. Brown says: 'Well, you tear your rig down and go to Robstown,' and I said, 'I have no contract at Robstown, but I have one at Blessing signed up, to go over to Blessing.' 'Why,' he said, 'You go on and tear it down, and go there, and by the time you get back to Houston, you will have a contract for you to sign.' So I came back to Houston and found there was a contract for me to sign, and I then went down to Robstown with the rig and set it up there.

"The conversation that I told you about was not between Mr. Brown and I; it was between Mr. Brown and Mr. Heyser, in my presence. The well was all right when I left there. I do not claim to be an expert on this water proposition; I leave that to somebody else. What I said Mr. Brown told me was to pull up my rig and

go to Robstown. I told Mr. Brown, in response to that, that I didn't have a contract to drill at Robstown, and he then told me to go ahead, that there would be a contract for me here for it, and he said he was in a hurry because the water down there was short, and he said, 'hurry up.' That is substantially what Mr. Brown told me, just like I said a while ago; that is the substance of it."

He further testified:

"Mr. Heyser stayed on the job at Sinton all the while the wells were being drilled. When they stopped at the depth they did, Mr. Heyser was there. Mr. Heyser was connected with the railroad company in the water service department. All the wells that appellee drilled for the Brownsville Railroad Company, Mr. Heyser was present representing the railroad company. When the wells were completed Mr. Heyser reported the completion. Mr. Heyser would make his reports on those wells, and Mr. Brown would come and accept them, and we would tear down our rigging and go to another job. When this well at Sinton was completed, Mr. Heyser told Mr. Brown what it was producing, the depth of it, and Mr. Brown told me to tear down our rigging and go to Robstown. Mr. Brown did not get off the train to see the well himself at all."

The witness Heyser testified:

"Was in the employ of the defendant company at the time the well in question was drilled; quit the service of the company when said well was finished; was inspector for defendant; was at the well practically all the time; was present there as inspector for the company; was working directly under Mr. Brown's instructions; my duties were to see that they got the contract amount of water, 100,000 gallons in 24 hours, and see how much casing was used; recall the depth of the well. After Mr. Roberts and his crew washed the well and pumped it, and ascertained it had a flow of more than 100,000 gallons per day, Mr. Brown was out there; we told him we had 108,000 gallons in 24 hours; Mr. Brown was on the rear end of the platform while the train stopped there; I was waiting there to see Mr. Brown, to see what was the next move. My duties there other than to inspect the well as to quantity and perform the other matters I have testified about here were to see that they got the proper amount of water, and to see how much casing was used in the depth.

"I was sent there as representative of the company, to see that the contract was carried out. When this contract was completed, and Mr. Roberts and I had satisfied ourselves that we had this flow of water, Mr. Roberts was present with myself, and I met Mr. Brown and told him the quantity of water. In the conversation had between Mr. Brown and I with Mr. Roberts on that particular day, after I had stated to him what I had there, and Mr. Roberts had stated what he had, Mr. Brown told Mr. Roberts to tear down the machinery and go on up to Robstown.

"Mr. Roberts and I were present and told Mr. Brown of the flow of the water we had. He told Mr. Roberts to tear down his rigging and go on up to this other place, Robstown. There was nothing said about salt water then, and after this well had been drilled and we had tested it with air compressor, I informed Mr. Brown that the contract had been performed so far as I was concerned. I had been on three wells that Mr. Roberts had drilled prior to the one in question; those three wells were accepted on my recommendation, with instructions from Mr. Brown, of course. I would always wire or write Mr. Brown the quantity of water we had. During the time I was with them there was no well that Roberts drilled accepted on any other statement save and except through Mr. Brown. There was no one except

myself who was connected with the road who accepted them except Mr. Brown. During all my service there with them there was no well accepted by Mr. Brown save and except by myself; not that I know of."

The witness Brown, who, at the time of the drilling of the well in question, was in charge of buildings, bridges, and water service of the defendant, testified:

"I heard the testimony this morning of Mr. Roberts concerning the conversation which he said took place when we were on the rear end of a Brownsville train, at the station of Sinton, and in the presence of Mr. Heyser; I recall that conversation, and it was about as Mr. Roberts spoke it. At the time that conversation was had, Mr. Heyser was standing on the steps on the back end of the train. In that conversation Mr. Heyser told me that they had developed 108,000 gallons with the air compressor, and that the well was practically clear of sand. I do not know that Mr. Roberts made any statement to me on that occasion other than that they had 108,000 gallons; he confirmed what Mr. Heyser had just told me. In response to what both these men told me, I told Mr. Roberts to go ahead and move to Robstown. I do not recall stating to him any reason for going to Robstown. The reason I told him to go to Robstown is we were short of water supply at that point at that time, and were very anxious to have the well started. I had understood that Mr. Roberts had the matter of Robstown up with Mr. Pyeatt. The quality of the water was not discussed at the time I had that talk with them. There was nothing else that I remember that was discussed at that time except the report of the quantity, and me telling him to go to Robstown.

"I had instructed some one to get a sample of the water out of this well before I saw Mr. Roberts and Mr. Heyser; I usually instructed Mr. Heyser to get such sample. It was on the 26th day of April, 1913, that I saw Mr. Roberts and Mr. Heyser at Sinton; it was prior to that time that I had requested a sample of water, about two days, I think, prior to that time, that I had requested the sample. I requested the sample of Mr. Heyser. Mr. Heyser reported and took instructions from me. At the time I was talking to Mr. Roberts, and about which I have testified, I had been advised that the sample of water had gone off for analysis. I had not had a report as to the analysis on it.

"I had Mr. Heyser on the job when those wells were drilled, and he reported to me, and of course when Mr. Roberts finished up a well in the natural course of things he would move. Mr. Heyser would report to me on each well after they had gone down so many feet, and that they had gotten a certain amount of water. Heretofore when Mr. Heyser would report to me when any of these wells were completed and everything was satisfactory, then I would report to my boss, and Roberts was moved ahead, and for that reason I never came in contact with him before this time in Sinton; that is a fact. I was just passing Sinton the time I had that conversation I told you about; I was not going there; I was going South. If I had not been going South I would have taken Heyser's statement again as to the depth of the well and the amount of water."

Plaintiff testified:

"I reached the stratum called for in the contract. I do understand that this contract called for a certain quality of water. And I understood that I went to the stratum that was in line with it. I also understand that if I had tried to go any further I wouldn't have gotten the water called for; it would have been salty. In other words, if I had not already gotten it there was no opportunity to get it by going deeper; not that kind of water."

Again he says:

"We never went deeper than that (940 feet) in that country. From my knowledge of that country, I have an idea that the stratum underneath that depth would be salt water. I know it to be a fact that wells in that vicinity dug beyond what we call the 940-foot stratum actually produce salt water. * * *"

Again he says:

"As in the Sinton contract it is also true with reference to the Robstown contract that I knew that there was a definite quality of water to be produced. You ask me if it is not a fact that I also knew that if I didn't get it at the 940-foot stratum or the 928-foot stratum when I reached that stratum that I could not go any further, and that there was no chance to perform the contract; but I did get the water. I know, of course, that if I didn't get the quality of water at that depth that I couldn't perform the contract because I couldn't go any deeper."

We think that the testimony above detailed falls far short of any proof of acceptance of the well by defendant as a compliance by plaintiff of his contract in so far as the quality of the water is concerned, and that therefore the answer of the jury to the special issue quoted was wholly unwarranted. There is no doubt that the well produced the quantity called for in the contract, and it is quite clear that at the time Mr. Brown told the plaintiff to pull down his rig and go to Robstown, that neither he, nor his agent Heyser, nor the plaintiff knew whether the quality of the water was equal to that of the courthouse well. All they knew at that time was that the quantity called for was being produced, and they further knew that if the water was not of the quality called for in the contract that nothing further could be done by plaintiff to produce water of that quality. As the plaintiff himself says:

"I knew, of course, that if I didn't get the quality of water at that depth I couldn't perform the contract because I couldn't go any deeper."

In such circumstances there was nothing left for plaintiff to do but to pull down his rig and move to the next place where he was under contract to sink a well, for it would have availed him nothing to have kept his machinery there; it being impossible for him to have gotten a different quality of water by means of its further use. The mere fact, therefore, that Mr. Brown told him to take down his rig and move, at a time when none of them knew whether the water was of the quality called for, and at a time before an analysis of it had been made, cannot, by any sort of construction be held as an acceptance as to quality which would bind the defendant to pay plaintiff the contract price for his work. The contract requiring plaintiff to produce water of a given quality may seem harsh, but the parties so contracted, and the courts can only enforce the contract as made, and are not at liberty to make a contract for them.

It follows from the views herein expressed that it is our opinion that plaintiff is not entitled to recover, and that the judgment of the court below should be reversed, and judgment here rendered for the appellant; and it has been so ordered.

Reversed and rendered.