John A. FRYE dba Frye Drilling Company et al., Appellants,

v.

The APPLEBY WATER SUPPLY CORPORATION, Appellee.

No. 1376.

Court of Civil Appeals of Texas, Tyler.

Nov. 6, 1980.

Rehearing Denied Dec. 11, 1980.

---

Wm. R. Pemberton, J. B. Sallas, Sallas, Meriwether & Pemberton, Crockett, for appellants.

Thomas L. Belanger, Adams & Belanger, Nacogdoches, for appellee.

MOORE, Justice.

Appellee, Appleby Water Supply Corporation, instituted suit against appellant, John A. Frye, d/b/a Frye Drilling Company (Frye), and Fidelity and Deposit Corporation of Maryland, the surety on Frye's performance bond, seeking damages for the breach of certain warranties contained in a contract in which Frye agreed to drill a water well for appellee. As grounds for a cause of action appellee alleged that under the terms of the contract Frye warranted that the well would produce 200 gallons of water per minute with less than one ounce of sand per 100 gallons of water during the first year after acceptance of the completed well. Appellee alleged that the well failed to meet such specifications. Appellant Frye and Fidelity and Deposit Corporation answered with a general denial. Frye also filed a counterclaim against appellee alleging that he had fully performed the contract in accordance with the plans and specifications and sought a recovery for the balance due and owing thereon in the amount of $3,200. By way of a defense Frye alleged that the reason the well failed was because the plans and specifications called for a verticle line shaft pump. He alleged that he warned appellee that this type of pump would destroy the well, but appellee nevertheless insisted on using the pump which resulted in the destruction of the well. Trial was before the court and jury. Pursuant to the jury's findings the trial court entered judgment on the verdict awarding appellee judgment for $32,712 against appellant Frye[1] and further decreed that Fidelity and Deposit Corporation was jointly and severally liable with Frye to the extent of $24,800 on such sum and rendered a take–nothing judgment against Frye from which judgment appellants duly perfected this appeal.

We affirm.

The record reveals that on January 18, 1974, the parties entered into a written construction contract for a deep water well

1. The jury found that fair market value of the well in its present condition was $4,000 and that the fair market value of the well assuming it to be free of defects was $32,000 which resulted in actual damage to appellee of $28,000. From this amount the court credited Frye with an offset in the amount of $3,200 representing the amount due and owing Frye on the contract leaving total compensatory damages in the amount of $24,800. The jury also awarded appellee $7,912 in consequential damages. Thus, upon adding the total amount of the compensatory damages and consequential damages, the court awarded appellee damages in the total amount of $32,712.

and pump for the contract price of $32,000. The relevant contractual provisions are as follows:

Item 1, NOTICE AND INSTRUCTIONS TO BIDDERS, P4. ... A maintenance bond *guaranteeing the repair of all damage due to improper materials or workmanship for a period of one year* after the acceptance of the work by the Owner will also be required. (Emphasis added.)

ITEM II, BIDDER'S PROPOSAL, BID PROPOSAL, Item # 1, Furnish all labor, materials, tools and equipment for drilling, construction and disinfection of one deep well *guaranteeing the well to yield* 200 gallons per minute at a pump setting of 350 ± feet as per the test conditions described herein and in *strict compliance with the plans and specifications* to a depth of approximately 960 feet for a lump sum amount ... (Emphasis added.)

TECHNICAL PROVISIONS, SECTION 1–DEEP WELL:

1–16 *Guaranteed Yield* –The Contractor shall guarantee a minimum yield of 200 gpm of potable water for one year at a pump setting of 350 feet.

\* \* \* \* \* \*

1–18 *Potable Water* –The completed well is further guaranteed to produce not more than (1) ounce of sand per 100 gallons of water at the guaranteed pumping rate.

Item V of the Construction Contract provided:

4. PERFORMANCE AND PAYMENT BOND. The contractor shall within ten days after the receipt of the Notice of Award and before the commencement of any operations hereunder execute the contract and furnish the Owner with a performance and payment bond in a penal sum equal to the amount of the contract price, conditioned upon the performance by the Contractor of all undertakings, covenants, terms, conditions and agreements of this contract. . . .

5. MAINTENANCE BOND. A maintenance bond in the amount of 20 percent of the contract price with a corporate surety approved by the Owner and the Engineer will be required. Such bond shall be provided before final payment is made to the Contractor and *shall guarantee the repair of all damage due to faulty materials* or *workmanship provided or done by the Contractor.* This guarantee shall remain in effect for a period of one year after the date of final acceptance of the job by the Owner. (Emphasis added.)

40. ACCEPTANCE. Final inspection and acceptance of the work shall be made for the Owner by the Engineer in collaboration with the Engineer for the Farmers Home Administration.

43. MAINTENANCE OF SYSTEM. The Contractor shall, for a period of one year after completion and acceptance of work, repair at his expense any leak or other failures . . . . In the event that the Contractor should fail to make such repairs and adjustments or other similar work, the Owner may do so and charge the Contractor the cost of the same. At the end of the 30 days, the Contractor may at his option furnish a maintenance bond for the remaining 11 months or he may elect to have the Owner retain the 10 percent for the remainder of the period.

The contract also included the following SPECIAL CONSTRUCTION CONTRACT PROVISIONS:

1. *Priority of Interpretation* : The contract documents are complimentary, and what is called for by one document shall be as binding as if called for by all. In case of conflict between any of the contract documents, priority of interpretation shall be in the following order: (1) special construction contract provisions, (2) construction contract, (3) performance and payment bonds, (4) special bonds, if any, (5) proposal, (6) special technical specifications, (7) technical specifications, and (8) plans.

3. The performance and payment bond required in Item V, Construction Contract, paragraph 4, meets the requirements for maintenance bond required by

paragraph 5 of the Construction Contract and a separate maintenance bond is not required.

The record reveals that Frye encountered much difficulty in the process of completing this well because of the production of sand above the maximum allowed by the contract. However, the parties apparently thought the problem had been remedied by December 1974, since appellee's engineer certified that the well had been completed in accordance with the plans and specifications. Thereafter, the well was accepted by appellee in April 1975. Frye was paid $28,000, which amount was ninety percent of the contract price. Shortly thereafter when the well was hooked into the distribution system the well again began to produce sand in excess of the maximum allowed under the contract.

In response to Special Issue No. 2 the jury found that the well failed to produce water at the guaranteed pumping rate of 200 gallons per minute with less than one ounce of sand per 100 gallons of water during the first year after acceptance of the well. Appellants do not dispute the fact that the well produced sand in excess of the amount warranted by the contract. In response to Special Issues Nos. 3 and 4 the jury found that Frye failed to fully repair or eliminate the excessive flow of sand in the well within one year after the same was accepted or at any time thereafter. Appellants do not challenge these findings nor do they contend that Frye eliminated the excessive flow of sand in the well.

The jury also made the following findings in response to Special Issue No. 14:

> Do you find from a preponderance of the evidence that John A. Frye, d/b/a Frye Drilling Company performed his obligations under the written agreement with Appleby Water Supply Corporation in accordance with the Plans and Specifications to the extent that the Appleby Well No. 2 was completed and developed.
>
> Answer: We do.

In response to Special Issue No. 15, by which the jury was asked to find what sum of money was due Frye as a result of his service performed under the written agreement, the jury answered "none."

Appellants contend under the first point of error that since the jury found in response to Special Issue No. 14 that Frye performed his obligations under the written contract in accordance with the plans and specifications to the extent that the well in question was completed and developed, it was a finding by the jury that he fully performed the contract. Under their second point, appellants contend that since the jury found Frye had performed his contract, the trial court erred in failing to disregard the jury's answer to Special Issue No. 15, finding that nothing was due and owing under the contract, and in refusing to enter judgment in favor of Frye on his counterclaim for the $3,200 balance due and owing on the contract. Proceeding on the premise that Frye had fully performed the contract and was entitled to the balance due thereon, appellants maintain that the trial court erred in refusing to render a take–nothing judgment against appellee on its suit for breach of contract. We are not in accord with this proposition.

It has generally been held or recognized that a driller's failure to fulfill his express agreements contained in a contract will preclude him from recovering the stipulated compensation or, in case all or any part of the compensation has been paid, render him liable to the owner for such amount. *Johnny Folmar Drilling Co. v. Quitman*, 345 S.W.2d 439 (Tex.Civ.App.–Texarkana) aff'd as to the drilling company, *Old Colony Ins. Co. v. Quitman*, 163 Tex. 144, 352 S.W.2d 452 (1961); *American Water Co. v. Bunge*, 213 S.W.2d 93 (Tex.Civ.App.–Galveston 1948, writ ref'd n. r. e.); *Saint Louis B. & M. R. Co. v. Roberts*, 189 S.W. 559 (Tex.Civ. App.–Galveston 1916, no writ); 90 A.L.R.2d 1346. In the instant case paragraph 43 of the Construction Contract sets out the appellant/contractor's general warranty quite clearly:

> The contractor shall, for a period of one year after completion and acceptance of the work, repair at his own expense *any* leak or *other failures.* (Emphasis supplied.)

Again in paragraphs 1–16 and 1–18 of the technical provisions, the appellant/contractor guaranteed and warranted as follows:

The contractor shall guarantee a minimum yield of 200 gpm of potable water for one year at a pump setting of 350 feet.

The completed well is further guaranteed to produce not more than one ounce of sand per 100 gallons of water at the guaranteed pumping rate.

The bond executed by appellants, rather than being a maintenance bond described in paragraph 5 of the Construction Contract, was a performance and payment bond executed pursuant to the terms of paragraph 4 of the Construction Contract and was conditioned as follows:

Prinicipal shall well and truly perform and fulfill all the undertakings, covenants, terms, conditions and agreements of said contract during the original term of said contract and any extensions thereof that may be granted by the owner, with or without notice to the surety, *and during the life of any guaranty required under the contract* . . . . (Emphasis added.)

■ As we construe the contract, Frye not only warranted that for a period of one year after completion and acceptance of the work, he would repair at his own expense any failures of the well, including faulty materials and workmanship, but also warranted and guaranteed that the completed well would produce not more than one ounce of sand per 100 gallons of water at the guaranteed pumping rate for a period of one year. This conclusion is supported not only by the terms of the contract but also by the terms and conditions of the performance and payment bond.

■ There is no question that to the extent of the manner of sinking and finishing the well and the depth to which it was drilled, Frye complied with the contract. Further, there is no question that the well after its completion produced the quantity of water called for in the contract. The jury so found. Finally, there is no question that the well failed to produce the quality

of water stipulated in the contract during the period of one year after the well was completed · and accepted and that Frye failed to fully repair or eliminate the excessive flow of sand in the well as he guaranteed to do under the terms of the contract. It follows that Frye must be held to have failed to perform the contract having breached his express warranty as to the quality of the water to be obtained. While the contract requiring Frye to produce water of a given quality may seem harsh, the parties so contracted. In these circumstances the courts can only enforce the contract as made and are not at liberty to make a contract for them. Having failed to perform the contract, it follows appellants are not entitled to recover thereon.

In view of our interpretation of the contract, it should now be apparent that we cannot agree with appellants' contention that the contract must be construed to mean that Frye's warranty was limited to only the materials and workmanship supplied in drilling the well and did not extend to a warranty as to the quality of the water. In this connection, it is appellants' contention that paragraph 5 of the Construction Contract has the effect of limiting Frye's obligation to a guarantee of the materials and workmanship for a period of one year. Therefore, they argue that Frye's warranty of the quality of the water contained in the Technical Provisions of the contract is in conflict with his limited warranty as to material and workmanship contained in the Construction Contract. Proceeding on this premise appellants rely upon the provisions of the Special Contract wherein it is provided that in the event of a conflict between the Construction Contract and other contract documents the terms of the Construction Contract shall control. Hence, they conclude that Frye's obligation was limited to a guarantee of materials and workmanship and that the warranty as to the quality of water contained in the Technical Provisions of the contract does not amount to a binding obligation. We do not agree. Nowhere in the contract did the parties stipulate that Frye's warranty was

limited to the repair of faulty workmanship and materials used in the drilling of the well. Under paragraph 43 of the Construction Contract, Frye agreed to repair, at his own expense any failure of the well. In view of this broad language an in the absence of any language in the contract specifically limiting Frye's liability to the repair of faulty materials and workmanship, the contract must be construed to mean that he also guaranteed the quality of the water. Having failed to fully perform the contract, appellants are not entitled to recover the balance due and owing thereon.

Appellants' points of error 3, 4, 5, and 6 are predicated upon the assumption that Frye's obligation was limited to the repair of defects caused by faulty materials or workmanship and did not extend to a warranty of the quality of the water. Inasmuch as we have held that Frye's obligation was not so limited, we do not reach these points.

Under points 7, 8, 9, and 10, appellants assert that the trial court erred in overruling their objections to Special Issues Nos. 12 and 13 on the ground that the issues improperly placed the burden of proof upon Frye.[2] We find no merit in these points and they are accordingly overruled.

Special Issues Nos. 12 and 13 were submitted in connection with appellants' alleged excuse for nonperformance of the contract. In their answer to appellee's suit for breach of contract, appellants alleged that prior to the time the vertical line shaft pump was installed in the well, both appellant, John A. Frye, and W. B. Dabney, appellee's engineer, appeared before the board of directors of Appleby Water Supply Corporation and advised its members that the vertical line shaft pump specified in the plans and specifications would damage or destroy the well. Appellants further alleged that the installation of the vertical line shaft pump as specified in the plans and specifications caused the destruction of the well. Upon trial, both Frye and Dabney testified that they advised appellee that the pump would damage or destroy the well but appellee's board of directors insisted that the pump be installed. They both testified that in their opinion the pump caused the damage or destruction of the well.

■ A party who seeks to avoid a contract or excuse his failure to perform has the burden of proving his excuse for nonperformance. 13 Tex.Jur.2d Contracts sec. 390; *Howell v. Kelly*, 534 S.W.2d 737 (Tex. Civ.App.–Houston [1st Dist.] 1976, no writ). Inasmuch as appellants had the burden of pleading and proving that Frye had a valid excuse for the nonperformance of the contract, we are of the opinion that the trial court properly placed the burden of proof upon appellants.

We reject appellants' contention that since W. B. Dabney, the engineer under the project testified that in his opinion the pump specified in the specification caused the well to fail, the burden of proof shifted to appellee to prove that the pump was not the cause of the failure of the well. The engineer's testimony, like all other testimony, merely serves to raise an issue of fact on what caused the well to fail.

By the eleventh point appellants seek a reversal on the ground that the jury's refusal to find that the well was damaged or destroyed because of the use of the vertical line shaft pump, in response to Special Issue No. 13, was contrary to the overwhelming weight and preponderance of the evidence.

■ The record reveals that numerous theories were presented at the trial to explain the failure of the well other than the theory espoused by appellants concerning

2. Special Issue No. 12:
  Do you find from a preponderance of the evidence that prior to the said pump being installed, that John A. Frye and/or W. B. "Bill" Dabney advised members of the board of directors of Appleby Water Supply Corporation that the pump specified in the plans and specifications would damage or destroy the well?
  Answer: We do not.
  Special Issue No. 13:
  Do you find from a preponderance of the evidence that the well in question was damaged or destroyed because the pump was installed in accord with the plans and specifications?
  Answer: We do not.

the vertical line shaft pump. Appellee's expert witness concluded that the excessive sanding condition would have existed regardless of whether a vertical line shaft pump or a submersible pump was used because the appellant/contractor attempted to "overproduce" the well. He further testified that the problem of "overproducing" was aggravated by the low water level and the inadequacy of the aquifer where the well was located. Other testimony was introduced showing that the problem with the well was the lack of an adequate gravel pack, rather than the particular type of pump used. In short, the issue as to whether the vertical line shaft pump caused the excessive sanding condition was a sharply contested issue. After weighing and balancing all of the testimony in the record, both that in favor of and against the jury's finding, we have concluded that we cannot agree with appellants' contention that the finding is contrary to the overwhelming weight and preponderance of the evidence.

Under the twelfth and final point of error, appellants contend that the trial court erred in denying their motion for new trial because the jury's finding in response to Special Issue No. 15 refusing to find that any sum of money was due and owing Frye, was contrary to the overwhelming weight and preponderance of the evidence. As we view the record the point must be overruled.

Since Frye failed to fully perform the contract due to the breach of his express warranty as to the quality of the water, the jury's finding on this damage issue becomes immaterial. *Burns v. Bridge Engineering Corp.*, 465 S.W.2d 427 (Tex.Civ.App.–Houston [14th Dist.] 1971, writ ref'd n. r. e.). Even if the jury's finding of "none" in response to this issue was against the great weight and preponderance of the evidence, our rules provide that no judgment will be reversed on appeal unless the error complained of was calculated to cause and probably did cause the rendition of an improper judgment. Rule 434, Tex.R.Civ.P. Inasmuch as appellants failed to establish that Frye fully performed the contract, the trial

court was compelled to render a take–nothing judgment against appellants on their counterclaim. Consequently, the jury's finding could not have resulted in any harm to appellants.

The judgment of the trial court is affirmed.