**FEDERAL SAVINGS AND LOAN IN-SURANCE CORPORATION, as Receiver for Liberty Federal Savings and Loan Association, Plaintiff,**

v.

**Elmo WILSON, Sr., et al., Defendants.**

**Civ. A. No. CA 3–88–0468–G.**

United States District Court,
N.D. Texas,
Dallas Division.

Sept. 15, 1989.

Jack D. Smith, Dorothy L. Nichols, Mark Gabrellian and Kathy Norcross, Office of Gen. Counsel, Federal Home Loan Bank Bd., Washington, D.C., Walter H. Mizell, Brown, Maroney, Rose, Barber & Dye, Austin, Tex., and Reboul, MacMurry, Hewitt, Maynard & Kristol, New York City, for plaintiff.

Fred A. Silva, Frank C. Damrell, Jr. and Wray F. Ladine, Damrell, Damrell & Nelson, Modesto, Cal., and John R. Elrod, Siloam Springs, Ark., for defendants.

## MEMORANDUM ORDER

FISH, District Judge.

This case is before the court on the plaintiff's motion for summary judgment on its claims against defendants Elmo Wilson, Sr.; Bob R. Smith; Kenneth C. Graham; Daniel Cooper; and Elmo Wilson, Jr.; and on the plaintiff's motion to dismiss affirmative defenses and offsets for lack of subject matter jurisdiction. After considering the motions, the court is of the opinion that the motion for summary judgment should be granted. Because this ruling disposes of all issues in the case except attorneys' fees, the court will not reach the motion to dismiss.

### I. *Background*[1]

On or about July 31, 1985, the Davis Building, 1926, Ltd., a Texas limited partnership ("principal obligor"), by and through its general partners, Kenneth L. Graham, Robert Cooper and the Jefferson Group, Inc., a Texas corporation, executed as maker and delivered to Liberty Federal Savings and Loan Association ("the S & L") an "All–Inclusive Deed of Trust Note" ("note") dated July 31, 1985. This note, payable to the order of the S & L, was in the original principal amount of $20,800,-000.00.[2] The note was secured in part by

---

1. Unless otherwise noted, there is no genuine issue regarding any of the facts stated herein.

2. Exhibit A to plaintiff's motion for summary judgment; joint pretrial order at 3; affidavit of Joseph O. Bollinger, Jr. ("Bollinger affidavit")

an "All–Inclusive Deed of Trust (with Security Agreement and Assignment of Rents)" ("deed of trust") dated July 31, 1985, and covering certain real property located in Dallas County, Texas.[3]

The purpose of the loan was to purchase and renovate a certain building in Dallas, Texas ("the Davis Building").[4] The manner and the amount of the disbursements to be made under the note were controlled by the note and a "Construction Loan Agreement" ("loan agreement") referred to in the note and executed as part of the closing papers when the S & L agreed to make the loan.[5]

The principal obligor is insolvent and is not a defendant in this case.[6] The plaintiff has not demanded payment from the insolvent principal obligor.[7]

On or about August 2, 7, and 8, 1985, the defendants each executed and delivered to the S & L separate but identical written guaranty agreements in which they unconditionally agreed to pay the S & L all principal, interest and collection costs incurred by the S & L on every claim against or indebtedness of the principal obligor related to the note and deed of trust.[8]

· The S & L gave value on the note and was the owner and holder of the note until the appointment of the Federal Savings and Loan Insurance Corporation ("FSLIC") as its receiver.[9] On April 24, 1987, the Federal Home Loan Bank Board ("FHLBB") appointed FSLIC as receiver of the S & L, and FSLIC as receiver took title and possession of all assets of the S & L, including its claims against defendants based on the note and guaranty agreements. 12 U.S.C. § 1464(d).[10] The note has matured by its terms and is now due and payable.[11]

On or about December 11 and 16, 1987 and January 14 and 15, 1988, with the principal obligor in default on the note for nonpayment of outstanding principal and accrued interest, counsel for FSLIC gave each defendant and N. Alex Bickley as their attorney written notice of the default and demanded payment for the past due installments of principal and interest. FSLIC expressed its intent to file suit to collect on the note and recover its litigation costs and attorneys' fees.[12] Defendants failed and refused, and continue to fail and refuse, to pay the amount due on the note.[13]

As of February 15, 1989, there was due and unpaid on the note the principal amount of $7,883,768.01 and accrued unpaid interest in the amount of $2,377,195.08. The total amount due on that date was $10,260,963.09, with interest continuing to accrue at $2,267.93 per day.[14]

## II. Analysis

### A. Standard for Summary Judgment

The standard for summary judgment is set out in this court's opinion in *Brewster v. City of Dallas*, 703 F.Supp. 1260, 1263 (N.D.Tex.1988).

### B. Elements of Plaintiff's Claims

The only issue of law in this case is whether FSLIC, as receiver of the S & L, is

(exhibit H to plaintiff's motion for summary judgment) at 1–2.

3. Exhibit B to plaintiff's motion for summary judgment; joint pretrial order at 3–4; Bollinger affidavit at 1–2.

4. Affidavit of Bertha Wilson ("Bertha Wilson affidavit") at 3; defendants' brief in opposition to plaintiff's motion for summary judgment at · 2–3.

5. Exhibit A to original complaint; exhibit A to amended answer; amended answer at 2–3.

6. Original complaint ¶ 8; joint pretrial order at 4.

7. Original complaint ¶ 8.

8. Exhibits C, D, E, F, and G to plaintiff's motion for summary judgment; joint pretrial order at 4; Bollinger affidavit at 2.

9. Joint pretrial order at 4.

10. Joint pretrial order at 4; original complaint ¶¶ 5–7.

11. Joint pretrial order at 4.

12. Affidavit of Judy Hopson (exhibit I to plaintiff's motion for summary judgment) at 1–2.

13. Joint pretrial order at 4.

14. *Id.*

entitled to a judgment on the note and guaranties. Generally, suits to enforce promissory notes are among the most suitable classes of cases for summary judgment. *Lloyd v. Lawrence,* 472 F.2d 313, 316 (5th Cir.1973); *North Denver Bank v. Freeby,* 285 F.Supp. 74, 77 (N.D.Tex.1967), *aff'd,* 394 F.2d 149 (5th Cir.1968). The elements of proof necessary to recover on a negotiable instrument are straightforward. *Lloyd,* 472 F.2d at 316. Under § 3.307(b) of the Texas Business and Commerce Code, "[w]hen signatures are admitted or established, production of the instrument entitles a holder to recover on it unless the defendant establishes a defense." Tex. Bus. & Com.Code § 3.307(b) (Vernon 1968). Under § 3.307, a cause of action against the maker of a promissory note is established if the plaintiff proves that:

(1) plaintiff is the holder of the note on which he sues;

(2) defendant signed the note;

(3) the note became due and payable; and

(4) defendant has not paid the amount due and owing.

*See Little v. Business Data Center, Inc.,* 550 S.W.2d 406, 407 (Tex.Civ.App.—San Antonio 1977, no writ).

Unless the defendant denies execution or properly raises an affirmative defense, the plaintiff will prove its cause of action and be entitled to summary judgment by submitting a sworn affidavit based on personal knowledge of the appropriate corporate official which (1) identifies the note signed by the defendant maker; (2) avers that the plaintiff is the holder of the note; and (3) sets forth the sum owing on the note. *Little,* 550 S.W.2d at 407.

### C. The Merits of the Defendants' Affirmative Defenses and General Claims to Offsets [15]

In their amended answer, the defendant guarantors allege the following affirmative defenses and offsets: (1) breach of contract, (2) breach of duty of good faith and fair dealing, (3) failure of consideration, and (4) fraud. Beyond the defenses raised in the amended answer, defendants Elmo Wilson, Jr. and Bob R. Smith argue (5) reliance on advice of counsel (representing to them that they would not be liable on the note),[16] while Elmo Wilson, Sr. argues (6) mental incapacity.[17] The court will address each of these defenses in turn.

#### 1. Breach of Contract [18]

Defendants argue that the S & L breached the loan agreement by refusing to dis-

---

**15.** On May 31, 1988, this court granted the plaintiff's motion to dismiss the defendants' counterclaims based on the *Hudspeth* doctrine. *See North Mississippi Savings & Loan Association v. Hudspeth,* 756 F.2d 1096 (5th Cir.1985), *cert. denied,* 474 U.S. 1054, 106 S.Ct. 790, 88 L.Ed.2d 768 (1986). In *Coit Independence Joint Venture v. Federal Savings and Loan Insurance Corporation,* — U.S. —, 109 S.Ct. 1361, 103 L.Ed.2d 602 (1989), the Supreme Court substantially overruled the holding of *Hudspeth.* The legal bases for the counterclaims brought in the defendant's answer filed April 18, 1988 are entirely preserved and contained in the offsets and affirmative defenses brought in the defendants' amended answer of July 7, 1988. Because the allegations in the answer are identical to those in the amended answer in both wording and substance, the court can fully address them in this memorandum order without troubling to vacate its prior order dismissing the counterclaims.

Also, because the court fully addresses the defenses of Elmo Wilson, Sr. that were urged in his brief in opposition to plaintiff's motion for summary judgment (although not formally pled), his motion to amend accelerated schedul-

ing order to continue trial, to extend time to file amended pleadings, and to extend time to file pretrial material is denied.

**16.** Brief in support of plaintiff's motion for summary judgment at 9.

**17.** Brief in opposition to plaintiff's motion for summary judgment at 6–11.

**18.** The terms of various documents, insofar as they are material to this memorandum order, are unambiguous. Consequently, this issue is ripe for summary judgment. *Southern Natural Gas Company v. Pursue Energy,* 781 F.2d 1079, 1081 (5th Cir.1986); *Union Planters National Leasing, Inc. v. Woods,* 687 F.2d 117, 120 (5th Cir.1982); *Freeman v. Continental Gin Company,* 381 F.2d 459, 465 (5th Cir.1967).

Here, the court will assume *arguendo* that the loan agreement imposes bilateral obligations on the parties, rather than just a unilateral obligation on the maker and guarantors to pay a sum certain. *See Federal Deposit Insurance Corporation v. McClanahan,* 795 F.2d 512, 515 (5th Cir.1986). *But see* Part II.C.3. below.

burse the amount of the loan in accordance with its terms.[19] They maintain that this breach defeated their ability to complete the renovation of the Davis Building according to plan and thereby precludes the plaintiff from collecting on the note.[20]

The note specifically refers to the loan agreement, "which contain [sic] certain conditions upon which the indebtedness represented by this Note may be accelerated and become due and payable in full prior to the maturity stated herein."[21] The note also refers to the deed of trust, which creates some of the liens and security interests securing the note.[22] The deed of trust in turn refers to the loan agreement as the document controlling the manner in which the principal amount of the loan[23] was to be disbursed.[24]

In or around May 1986, the S & L stopped funding the loan. The plaintiff argues that this conduct was authorized by § 2.06 of the loan agreement, which allowed the S & L to vary the amounts of its disbursements under the note from the amounts allocated in the approved budget to protect its collateral or insure a borrower's or guarantor's performance.[25] There is testimony that in May 1986 the principal obligor requested a revision in the budget so that it would not exceed its allocation for interest.[26] It was a written request.[27] Neither party addresses this point, but it would appear that the request was proper pursuant to § 7.03 of the loan agreement, entitled "Modifications."[28] There is no evidence that the principal obligor exceeded the budget without approval. The court is reluctant, in the context of the loan agreement as a whole, to read § 2.06 as broadly as the plaintiff reads it without some showing that the principal obligor failed to meet a condition or committed an event of default under § 2.05 and Article V of the loan agreement.[29]

■ It is the defendants' burden, however, to prove the breach as an estoppel of the plaintiff's claim. *Frye v. Appleby Water Supply Corporation*, 608 S.W.2d 798, 803 (Tex.Civ.App.—Tyler 1980, writ ref'd n.r.e.). *See Blackstock v. Gribble*, 312 S.W.2d 289, 293–95 (Tex.Civ.App.—Eastland 1958, writ ref'd n.r.e.). *See also Matter of Texas Mortgage Services Corporation*, 761 F.2d 1068, 1074–75 (5th Cir.1985). Not only have the defendants failed to offer any evidence of a breach, but they seem to *agree* that the loan agreement and legal lending limits[30] authorized the S & L's conduct.[31] *See Celotex Corporation v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548,

19. Amended answer at 2–3.

20. *Id.*

21. Note (exhibit A at 3 to original complaint).

22. *Id.*

23. The note was a "wraparound" note, so it included in its principal amount the unpaid balance of a prior note in the amount of $11,125,000.00 the S & L purchased from Stockton Savings Association ("Stockton"). *See* amended answer at 2; loan agreement, exhibit A to amended answer at cover sheet. Thus, the loan agreement applied to the disbursement of funds over and above the prior (i.e., Stockton) note, not to exceed $9,675,000.00. *Id.*

The defendants argue, and the plaintiff concedes, that the plaintiff has no valid claim against them for the prior note. Amended answer at 5; plaintiff's brief in support of motion for summary judgment at 19. Indeed, the plaintiff urges that it has never sought to recover "any part of the liability evidenced by the Stockton Note in this litigation." *Id.* The court will thus assume that the plaintiff seeks to recover only that part of the loan evidenced by the loan agreement, which was not to exceed $9,675,000.00 in principal amount.

24. Exhibit B at 6 to original complaint.

25. Exhibit A at 7 to amended answer.

26. Deposition of Kenneth Graham ("Graham deposition") at 44–45.

27. *Id.*

28. *Id.;* exhibit A at 16 to amended answer.

29. *Id.*

30. The defendants do not deny that legal lending limits would also support the plaintiff's conduct as a contractual matter. Rather, they vehemently argue that the plaintiff committed fraud because it never intended to fully fund the loan in the first place. Defendants' brief in opposition to plaintiff's motion for summary judgment at 17. *See* Part II.C.3. below.

31. Defendants' brief in opposition to plaintiff's motion for summary judgment at 17.

2552–53, 91 L.Ed.2d 265 (1986) (once moving party has pointed out the absence of a genuine issue of material fact which the non-movant has the burden of proving at trial, the non-movant's failure to carry that burden in its response will support summary judgment).

■ Also, the loan agreement was between the S & L and the principal obligor, not the guarantors, who unconditionally guaranteed the payment of the note and waived "any defense or rights of set-off or counterclaim which [the principal obligor] may have or assert...." [32]

### 2. Breach of Duty of Good Faith and Fair Dealing

■ The defendants argue that the loan agreement, the note, and the guaranties together imposed on the plaintiff an implied duty of good faith and fair dealing.[33] The defendants allege that the plaintiff breached this duty in its conduct described in Part II.C.3. below.[34] It is not necessary to describe that conduct here, because the defense fails at the threshold. Under Texas law, there is no implied covenant of good faith and fair dealing in every contract. *English v. Fischer*, 660 S.W.2d 521, 522 (Tex.1983). *See Thompson v. M & B Construction Corporation*, 585 F.Supp. 561, 563–64 (N.D.Tex.1984). *See also Lexington Insurance Company v. Bennett Evans Grain Company*, 642 F.Supp. 78, 83–84 (S.D.Tex.1986); *Pace v. Garcia*, 631 F.Supp. 1417, 1420 (W.D.Tex.1986); *Exxon Corporation v. Atlantic Richfield Company*, 678 S.W.2d 944, 947 (Tex.1984); *McClendon v. Ingersoll–Rand Co.*, 757

S.W.2d 816, 819–20 (Tex.App.—Houston [14th Dist.] 1988, writ granted). Texas courts have recognized an implied duty of good faith and fair dealing where there is a special relationship between the parties to a contract. *Id.* But the defendants do not allege or argue for such a special relationship here, and at least one Texas court has refused to imply such a duty or covenant in a similar context. *See Cluck v. Frost National Bank of San Antonio*, 714 S.W.2d 408, 409–10 (Tex.App.—San Antonio 1986, writ ref'd n.r.e.) (no covenant of good faith and fair dealing would be implied where payee refused to accept late payments on note after payee accelerated the note and foreclosed its lien on the deed of trust securing the note). This court will abide by its own precedent and find no such relationship between the guarantors and payee of a secured promissory note, where the payee stopped disbursements on the note to avoid exceeding its legal lending limits. *See Thompson*, 585 F.Supp. at 562–64.

### 3. Failure of Consideration, Fraud, Advice of Counsel, Mental Capacity, and the D'Oench, Duhme Doctrine [35]

In *D'Oench, Duhme & Co., Inc. v. Federal Deposit Insurance Corporation*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), the Supreme Court held that secret agreements

> designed to deceive the creditors or the public authority or [that] would tend to have that effect [may not be asserted as a defense against the FDIC suing in its corporate capacity to collect on a note].

**32.** Guaranty Agreements (exhibits C, D, E, F, and G to original complaint). The guaranty agreements convert the note to a non-recourse debt for the guarantors at the same time the note becomes non-recourse for the principal obligor, but the defendants have not shown that the conditions precedent to making the note non-recourse ever occurred. *Howell v. Kelly*, 534 S.W.2d 737, 740 (Tex.Civ.App.—Houston [1st Dist.] 1976, no writ). *See Frye*, 608 S.W.2d at 803. Exhibits C–G at 2 and exhibit A at 5–6 to original complaint. The defendants argue that the S & L blocked their ability to benefit from the limited personal liability section of the note, and that there was therefore a failure of consid-

eration. That argument is addressed at Part II.C.3. below.

**33.** Amended answer at 6–7.

**34.** *Id.*

**35.** At the outset, the court would note that the defendants cannot rely on personal defenses of the principal obligor. *Continental Illinois National Bank and Trust Company of Chicago v. Windham*, 668 F.Supp. 578, 584–85 (E.D.Tex. 1987). Several of the defendants' factual theories supporting the affirmative defenses of failure of consideration and fraud fail on that ground alone.

It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority ... was or was likely to be misled.

*Id.* at 460, 62 S.Ct. at 681. *See Federal Savings and Loan Insurance Corporation v. Murray*, 853 F.2d 1251, 1253–54 (5th Cir.1988).

The effect of the rule as it was first enunciated is that a person who, to accommodate a bank, executes an instrument which is in the form of a binding obligation, should be estopped from arguing that the parties agreed simultaneously that the instrument would not be enforced. *D'Oench, Duhme & Co., Inc.*, 315 U.S. at 459, 62 S.Ct. at 680. This means that once the maker gives the bank permission to carry a note as a real asset, that permission is presumed to include authority for the bank to treat the note and its terms as genuine for the purposes of general banking activities and examination by public authorities. *Id.* Whether a defendant's creditor (the bank or savings and loan) is actually deceived or specifically injured is not relevant, because the rule is concerned with the "evil tendency" of acts that would contravene public policies governing banking transactions. *Id.* at 459, 461, 62 S.Ct. at 680, 681. The case law has extended the protection of *D'Oench* to FSLIC in its corporate and receivership capacities. *Federal Savings and Loan Insurance Corporation v. Lafayette Investment Properties, Inc.*, 855 F.2d 196, 198 (5th Cir.1988); *Murray*, 853 F.2d at 1254; *Federal Deposit Insurance Corporation v. McClanahan*, 795 F.2d 512, 514 (5th Cir.1986).

The original purpose of the *D'Oench* doctrine was to protect the Federal Deposit Insurance Corporation ("FDIC") and the public funds it administers against misrepresentations regarding transactions with banks to which the FDIC makes loans or involving bank assets that the FDIC insures. *D'Oench, Duhme & Co., Inc.*, 315 U.S. at 457, 62 S.Ct. at 679. The doctrine and its underpinnings remain vital in the current wave of FSLIC receiverships for insolvent thrift institutions. FSLIC must be able to rely on a savings and loan's records in tallying its assets. FSLIC must take such a tally in deciding whether to (1) liquidate the institution and pay depositors their insured amounts or (2) arrange a purchase and assumption transaction, where another institution buys and reopens the failed one without service interruption or depositor losses. *See Langley v. Federal Deposit Insurance Corporation*, 484 U.S. 86, 108 S.Ct. 396, 401–02, 98 L.Ed.2d 340 (1987). *See also Murray*, 853 F.2d at 1256. Evaluation of assets for the second type of takeover "must be made 'with great speed, usually overnight, in order to preserve the going concern value of the failed [institution] and avoid an interruption in banking services.'" *Langley*, 484 U.S. at 91, 108 S.Ct. at 401 (quoting *Gunter v. Hutcheson*, 674 F.2d 862, 865 (11th Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982)). The FSLIC cannot make reliable evaluations if the savings and loan's records contain "seemingly unqualified notes that are in fact subject to undisclosed conditions." *Id. See Murray*, 853 F.2d at 1256 (FSLIC's "ability to tally a failing institution's assets and liabilities quickly and accurately lies at the heart of deciding to arrange [and carry out] a purchase and assumption deal" but FSLIC's efforts to do this "are thwarted if it must guess at the value of the institution's notes in light of various potential personal defenses available to the debtors").

The identical policies giving force to the *D'Oench* doctrine have led the Fifth Circuit and other courts to endow FSLIC "with at least the status of a holder in due course" when it becomes the holder of a note as part of a purchase and assumption transaction. *Murray*, 853 F.2d at 1256 (held, to counter state laws that would frustrate the policy of the *D'Oench* doctrine, to avoid windfalls to makers at the expense of a failed institution's depositors, creditors and shareholders, and to have uniformity of law with the FDIC, FSLIC would be clothed with at least holder in due course status). *See Matter of CTS Truss, Inc.*, 868 F.2d 146, 150 (5th Cir.1989).

### a. Failure of Consideration

■ The defendants argue that there was a failure of consideration because the

S & L defeated their rights to render the note a non-recourse debt when it stopped funding the loan.[36] Each guaranty agreement contains an interesting escape hatch to the guarantor's promise of unconditional guaranty and waiver of defenses:

> At the time by its provisions that the Note bears no personal liability as provided in the paragraph contained therein entitled Limited Personal Liability, Guarantor thereafter will have no personal liability hereunder and Lender shall return this Guaranty Agreement to Guarantor.[37]

*See* note 32 above. In turn, the "Limited Personal Liability" section of the note converts the recourse debt represented by the note into a non-recourse debt "after the date the Note commences to bear interest at thirteen percent (13%) per annum" and then only if the maker is not in default at that time.[38] The defendants argue that the S & L defeated their opportunity to render their guaranties non-recourse when it stopped funding the loan. The court finds no merit in this argument.

Failure of consideration means a failure to perform a promise that was a condition precedent to the maker's (or here, the guarantor's) performance. *Langley,* 484 U.S. at 92, 108 S.Ct. at 401–02. Not only have the defendants failed to prove that disbursing funds was a condition precedent to their guaranties, they have failed to establish even a genuine issue of fact that the cessation of funding was a breach of either the note or the guaranties. *See* Part II. C.1. above.

Second, there is nothing in the text of the guaranties to show that the disbursement of the full loan was a condition or even a covenant effecting the defendants' performance of their obligations.[39] *See Home Savings Association v. Tappan Company,* 403 F.2d 201, 203 (5th Cir.1968) (conditions precedent not favored under Texas law); *Willow Bend National Bank v. Commonwealth Mortgage Corporation,* 722 S.W.2d 12, 14 (Tex.App.—Dallas 1986, writ ref'd

n.r.e.) (same); *Texas City Refining, Inc. v. Universal Oil Products Co.,* 681 S.W.2d 303, 305 (Tex.App.—Houston [14th Dist.] 1984, no writ) (if contract term is ambiguous, court should presume it is covenant and not condition); *Community Development Service, Inc. v. Replacement Parts Manufacturing, Inc.,* 679 S.W.2d 721, 724 (Tex.App.—Houston [1st Dist.] 1984, no writ) (same).

Absent a breach of any mutual obligations that appear on the face of the financial documents now held by FSLIC, *see McClanahan,* 795 F.2d at 515 and note 32 above, the defendants are left only with the "understanding" that the note would be funded at least until the debt became non-recourse. The *D'Oench* doctrine is designed to estop the defendants from asserting this very type of agreement. *See Murray,* 853 F.2d at 1255; *Federal Savings and Loan Insurance Corporation v. Ziegler,* 680 F.Supp. 235, 237 (E.D.La.1988); *Federal Deposit Insurance Corporation v. Vineyard,* 346 F.Supp. 489, 492–93 (N.D. Tex.1972). The claims of FSLIC, in its court-approved status of "at least a holder in due course," prevail over this personal defense. *See Jonwilco, Inc. v. C.I.T. Financial Services,* 662 S.W.2d 664, 666 (Tex.App.—Houston [14th Dist.] 1983, no writ).

### b. Fraud

As an entity with at least the rights of a holder in due course, the FSLIC may sue on a note free from at least all personal defenses of the maker, and subject at most only to real defenses. *See Langley,* 484 U.S. at 93–94, 108 S.Ct. at 402; *Murray,* 853 F.2d at 1256–57. *See also* Tex.Bus. & Com.Code § 3.305(b) and comment 7 (Vernon 1968). In *Langley,* the Supreme Court distinguished between the personal defense of fraud in the inducement (a promise to perform some duty in connection with a note which the promisor did not intend to perform at the time the promise was made)

---

**36.** Amended answer at 4–5.

**37.** Exhibits C–G at 2 to original complaint.

**38.** Exhibit A at 5 to original complaint.

**39.** *See* exhibits C–G to original complaint.

and fraud in the factum (a factual misrepresentation which induces a party to sign a note without knowledge of, or a reasonable opportunity to obtain knowledge of, its character or essential terms). *Langley,* 484 U.S. at 93–94, 108 S.Ct. at 402; Tex. Bus. & Com.Code § 3.305(b)(3). *See Federal Deposit Insurance Corp. v. Amberson,* 676 F.Supp. 777, 780–81 (W.D.Tex.1987). Doctrinally, the reason for treating the two defenses differently in the context of *D'Oench* is that fraud in the inducement renders the title to the note merely voidable, while fraud in the factum renders any such claim to title void. *Langley,* 484 U.S. at 93–94, 108 S.Ct. at 402.

The Fifth Circuit has expressed skepticism about this distinction. The availability of "real" defenses against the FSLIC or FDIC, as suggested by the Supreme Court, is just that in the Fifth Circuit: a suggestion. *Templin v. Weisgram,* 867 F.2d 240, 241–42 (5th Cir.1989). *See also Lafayette Investment Properties, Inc.,* 855 F.2d at 198 n. 2 ("[w]e hold that the *D'Oench, Duhme* doctrine is applicable and therefore the FSLIC status as a holder in due course is immaterial"). The Fifth Circuit, and therefore this court, remain more concerned with "the manner in which an instrument is proven to be void, not the conclusion that the instrument is void." *Templin,* 867 F.2d at 242. If an instrument's invalidity can only be established by reference to a side agreement of which the FSLIC cannot be charged with knowledge, then the *D'Oench* doctrine will apply "with full force." *Id.* Fraud in the factum, by definition, does not involve proof of side agreements, and therefore may be valid as a defense to the FSLIC's claim, both under *D'Oench* and Texas Bus. & Com.Code § 3.305(b)(3). *Id. Cf. Federal Savings and Loan Insurance Corporation v. Salamone,* No. CA 3–88–0870–R at 7, 1988 WL156828 (unpublished) (N.D.Tex., July 29, 1988).[40]

■ To whatever extent the distinction between fraud in the factum and fraud in the inducement is useful, it is still the defendants' burden to establish those basic elements which apply, whether fraud is asserted as a real or a personal defense. R.A. Anderson, *Uniform Commercial Code* § 3–305:26 at 865 (1971 and Supp. 1983). Against this backdrop, the defendants' allegations of fraud have no merit.

First, the defendants have produced no evidence that any of them were misled into signing the guaranties without knowledge of their character or essential terms. *See Jonwilco, Inc.,* 662 S.W.2d at 666 (dealer could only claim fraud defense under Tex. Bus. & Com.Code § 3.305 by showing it was "duped into signing a note thinking that it was some other type of instrument or misunderstanding the essential terms of the note"); *Favors v. Yaffe,* 605 S.W.2d 342, 345 (Tex.Civ.App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.) (same). The defendants' failure to adduce such evidence will support summary judgment. *Celotex Corporation,* 477 U.S. at 323, 106 S.Ct at 2552–53.

Second, the S & L's alleged misrepresentations all belong in the fraud in the inducement category. The defendants allege that they were induced to execute the agreements by the S & L's fraudulent misrepresentations that it would fund the full amount of the loan,[41] that Stockton would be responsible for payment,[42] and that the

**40.** Although *Langley* and *Templin* dealt with 12 U.S.C. § 1823(e) as it codifies the broader common law rule of *D'Oench,* those cases are relevant to common law applications of the *D'Oench* doctrine. *Lafayette Investment Properties, Inc.,* 855 F.2d at 198 n. 1. *See Beighley v. Federal Deposit Insurance Corporation,* 868 F.2d 776, 783–84 (5th Cir.1989).

**41.** Amended answer at 2–3. Defendants argue that the S & L never anticipated advancing the full amount of the note because the transaction exceeded the S & L's own loan limits and be-

cause, pursuant to an agreement between the S & L and Stockton, the note was a "wrap-around" note. Amended answer at 2–4, 5. *See* note 23 and accompanying text above.

**42.** Amended answer at 6. As part of the alleged transaction between Stockton and the S & L, defendants allege that Stockton (1) siphoned off $2,000,000.00 which was destined for the project and (2) concealed appraisals which would have disclosed that the property in question was substantially less valuable than the total amount of the indebtedness. Amended answer at 5.

building was appraised at a high value.[43] But the defendants knew the character and essential terms of the note, guarantees, and loan agreements, as is evidenced by their analysis of the documents in their assertions of breach of contract and failure of consideration. The claims of fraud are thus barred by FSLIC's status of at least holder in due course. Tex.Bus. & Com. Code § 3.305(b) and comment 7.

█ Finally, assuming *arguendo* that the defendants' lack of proof and the FSLIC's holder in due course status do not bar the fraud defenses, the *D'Oench, Duhme* doctrine does.

(1) *Promise to Fund the Loan:* The defendants proffer evidence that the S & L made oral assurances that it would be able to fund the entire amount of the loan.[44] Defendants also argue that the S & L could never have intended to fund the full amount of the $20,800,000.00 wraparound note since that amount clearly exceeded the legal lending limit.[45] The resolution of the merits of these arguments is that the note and the loan agreement plainly state that the primary balance of the note includes the balance of a prior Stockton note, and that the amount of the actual loan would not exceed $9,675,000.00.[46] The answer under *D'Oench* is simpler. Oral representations by the S & L officer constitute oral side agreements estopped by *D'Oench. Lafayette Investment Properties, Inc.*, 855 F.2d at 197–98; *Federal Deposit Insurance Corporation v. Cardinal Oil Well Servicing Co., Inc.*, 837 F.2d 1369, 1371–72 (5th Cir.1988) (*D'Oench* doctrine applies to guaranty agreements); *Ziegler*, 680 F.Supp. at 237. Neither are the S & L's legal lending limits an answer to *D'Oench. See Federal Deposit Insurance Corpora-*

*tion v. Van Laanen*, 769 F.2d 666, 667 (10th Cir.1985) (where defendant executed agreement assuming up to $35,000.00 of a limited partnership's bank debt, because the agreement was carried as a real asset on the bank's books, it was irrelevant whether defendant knew that the agreement effectively overstated the bank's assets).

(2) *Indemnity Agreement Between Stockton and the S & L:* The defendants also claim, in effect, that they should not be held liable on the guaranties because the S & L made a side arrangement with Stockton where Stockton would indemnify the S & L on the wraparound note.[47] Setting aside the fact that this contention, if proved, is insufficient to present a triable issue of fact on the defendants' claim of fraud, it is estopped by *D'Oench. See Amberson*, 676 F.Supp. at 779–80 (where bank and guarantor had understanding that bank would obtain additional security for the guaranteed note, and the understanding was evidenced by letters between bank officers and the bank's attorney with copies sent to defendant guarantor, the defendant was estopped under *D'Oench* from asserting the bank's promise as a defense because there was no indication in any document that the defendant agreed to guarantee the note only on the condition that additional security existed). To allow the defendants to rely on the alleged indemnity agreement would tend to reduce the value of the guaranties and thereby mislead the FSLIC in assessing the S & L's assets. *See D'Oench, Duhme & Co., Inc.*, 315 U.S. at 454, 62 S.Ct. at 678 (bank gave receipt for note stating that note would not be called for payment, rendering the note a mere accommodation agreement—if the re-

---

**43.** Amended answer at 5–6.

**44.** Graham deposition at 65–66.

**45.** Amended answer at 3–4; exhibit B to amended answer.

**46.** *See* exhibit A at 3 to original complaint; exhibit A at coversheet to amended answer. If the defendants are arguing that this latter amount exceeded the legal limit, they have not made that clear to the court. At any rate, the loan

agreement stated clearly that the S & L would loan up to $9,675,000.00, but in no event would it fund the loan in excess of its lending limit. Exhibit A to amended answer at coversheet, 5–6. *See* note 23 above.

**47.** Amended answer at 5–6. The transaction between the S & L and Stockton are the subject of a separate law suit in this court, styled *Federal Savings and Loan Insurance Corporation v. Stockton Savings Association, et al.*, case number CA 3–87–1302–F.

ceipt were given effect—to save bank from showing past due bonds among its assets); *Lupin v. Federal Savings and Loan Insurance Corporation,* Civil Action Numbers 85–5896, 86–0828, 86–1126, 1987 WL9106 (unpublished) (E.D.La., March 30, 1987) (available on LEXIS and WESTLAW) (where S & L lent money to defendants, which defendants used to buy into a partnership, and defendants relied for their defenses on written partnership agreement which was not secret but was in public records, the FSLIC was bound only by the note and mortgage in the bank's documents).

(3) *Over–Appraisal of the Davis Building:* The defendants have some evidence that the S & L's appraisal of the Davis Building was substantially higher than the appraisals by the FHLBB or by Stockton, all performed in 1985.[48] From this, the defendants allege that the S & L artificially inflated the value of the Davis Building to induce the principal obligor to execute the note and the defendants to guarantee it.[49] Defendants further allege that the FSLIC itself was on notice that the S & L's appraisal was artificially inflated, and that Stockton concealed more realistic appraisals.[50] The arguments have no merit. The assets of a failed institution taken over by FSLIC will not be diminished where the defendants executed unqualified guaranties subject to an unwritten condition consisting of the "truthfulness of a warranted fact", here, the value of the Davis Building. *Murray,* 853 F.2d at 1255 (quoting *Langley,* 484 U.S. at 94, 108 S.Ct. at 402). The FSLIC's knowledge of any misrepresentation by the S & L, prior to acquiring the note, guaranties and other documents, is not relevant to the application of *D'Oench.* Assuming the accuracy of the defendants' allegations, the note and guaranties in this case remained transferable as voidable interests at worst, and the public, creditor, debtor and shareholder interests

in the FSLIC's rapid assessment of the S & L's assets remained in play. *See Langley,* 484 U.S. at 94–95, 108 S.Ct. at 402–03. *See also Federal Deposit Insurance Corporation v. Investor Associates X., Ltd.,* 775 F.2d 152, 155–56 (6th Cir.1985); *RSR Properties, Inc. v. Federal Deposit Insurance Corporation,* 706 F.Supp. 524, 531 (W.D. Tex.1989).

### c. Advice of Counsel

■ Although defendants do not allege this defense in their amended answer, defendants Elmo Wilson, Jr. and Bob R. Smith rely on this defense in their depositions. The FSLIC must be able to rely on the papers before it in determining its assets and liabilities. Where counsel advises a client that the client may execute an unconditional guarantee because it will never be called, that counsel and that client must bear the risk that the favorable circumstances giving rise to the execution of the loan and guarantee may change, or that a court will not read the contract as counsel hoped and affirmed it would. The FSLIC is not bound by the side-representations made to the defendants by the S & L it succeeds. *See Cardinal Oil Well Servicing Co.,* 837 F.2d at 1370–72.

### d. Mental Capacity of Elmo Wilson, Sr.

This defense also does not appear in the defendants' amended answer. It is alleged, however, in Elmo Wilson, Sr.'s brief in opposition to the plaintiff's motion for summary judgment. Elmo Wilson, Sr. signed the guaranty agreement at issue on August 7, 1985.[51] There is some evidence that at that time, the defendant "could have [experienced] diminished intellectual function of intermittent nature and variable degree" due to recorded episodes of cerebral ischemia before April 23, 1985.[52] The defendant's wife, Bertha Wilson, relates that her son, Elmo Wilson, Jr. and

---

**48.** Graham deposition at 25–28.

**49.** Amended answer at 5–6; defendants' brief in opposition to plaintiff's motion for summary judgment at 11–16.

**50.** *Ibid.;* Graham deposition at 25–28.

**51.** Exhibit E to original complaint.

**52.** Affidavit of William R. Metge, M.D., at 2–3.

two associates flew to the home of her and her husband's in Modesto, California, and tried to convince her and her husband to sign guaranty agreements for the loan on the Davis Building.[53] Wilson, Jr. and his associates "insisted" that the elder Wilson would not incur any liability because the guaranty was needed only for 48 hours and a separate indemnity agreement would prevent his personal liability.[54] Mrs. Wilson did not trust her son's associates and refused to sign.[55] Her seriously ill husband, who "looked confused," made comments and asked questions indicating he did not understand what he was being asked to sign.[56] When he did sign, he looked "tired, confused and weary." [57] Apparently, Wilson, Sr. signed a blank signature page without having seen the full guaranty agreement.[58]

Defendant Wilson, Sr. points out that the *D'Oench* doctrine applies only where the defendant "lent himself" to a scheme or arrangement likely to mislead or deceive federal regulatory authorities. *See Langley,* 484 U.S. at 93–94, 108 S.Ct. at 402; *D'Oench, Duhme & Co., Inc.,* 315 U.S. at 460, 62 S.Ct. at 680–81; *Salamone,* slip op. at 7. He would interpret this language to require "some modicum of *fault* attributable to the party attempting to assert the defense." [59] If this is true, the threshold of "fault" under *D'Oench* is very low. The maker of a note may have no idea that he is entering an arrangement that will deceive anyone. Indeed, he may be "very ignorant and ill-informed of the character of the transaction." *D'Oench, Duhme & Co., Inc.,* 315 U.S. at 458–59, 62 S.Ct. at 680. *See also Vineyard,* 346 F.Supp. at 493. As long as the transaction itself would tend to have the *effect* of misleading federal banking authorities, and as long as the defendant "lent himself" to the transaction by incurring some obligation, the *D'Oench* doctrine will apply to estop defenses arising out of the transaction. *See Cardinal Oil Well Servicing Co.,* 837 F.2d at 1372 (guarantor left unrevoked guaranties with bank); *McClanahan,* 795 F.2d at 513 (defendant recklessly signed blank promissory note and delivered it to a man previously convicted of bank fraud).[60]

The possible defenses to this doctrine are thus very limited in scope. If the defendant signs a note imposing bilateral obligations upon both parties, and not just unilateral obligations on the maker or guarantor, then the defendant may be heard regarding the S & L's breach of its obligation, especially if the defendant was "wholly innocent and not negligent" in failing to discover the breach. *McClanahan,* 795 F.2d at 515–16. It is also possible for a maker or guarantor to escape the force of the *D'Oench* doctrine and his own unilateral obligations where he can show he was "wholly innocent" of any awareness of his conduct because of extreme lack of sophistication or prevailing business practices. *Id.* at 516–17.

█ If the only question presented were the defendant Wilson Sr.'s signing of a signature page in blank, the court could label his behavior "reckless" and end the inquiry there. *Murray,* 853 F.2d at 1254–55. By arguing his mental incapacity, defendant Wilson, Sr. has raised the issue of his innocence regarding his awareness of his conduct. Because of the common law policies of *D'Oench* which clothe the FSLIC with at least holder in due course status, however, the defendant must not only prove his complete "innocence" in incurring the obligation as part of a misleading side agreement, he must also establish that the basis of his innocence is a defense available against a holder in due course. *Murray,*

---

**53.** Bertha Wilson affidavit at 2.

**54.** *Id.* at 2–3.

**55.** *Id.* at 3.

**56.** *Id.*

**57.** *Id.*

**58.** Defendant's brief in opposition to plaintiff's motion for summary judgment at 3.

**59.** Defendants' brief in opposition to plaintiff's motion for summary judgment at 6 (emphasis in original).

**60.** *Cf. RSR Properties, Inc.,* 706 F.Supp. at 531 n. 9.

853 F.2d at 1256; *McClanahan*, 795 F.2d at 516–17. *See Templin*, 867 F.2d at 242. *See also Langley*, 484 U.S. at 93–94, 108 S.Ct. at 402. A holder in due course takes an instrument free of the defense of mental incapacity. *Federal Deposit Insurance Corporation v. Ohlson*, 659 F.Supp. 490, 492 and n. 3 (N.D.Iowa 1987). *See* Tex. Bus. & Com.Code § 3.305(b)(2) and comment 5. *See also Lucas v. Whiteley*, 550 S.W.2d 767, 768–69 (Tex.Civ.App.—Amarillo 1977, writ ref'd n.r.e.) (citing *Williams v. Sapieha*, 94 Tex. 430, 61 S.W. 115, 116 (1901)).

### III. *Conclusion*

The plaintiff's motion for summary judgment is GRANTED. By September 29, 1989, the plaintiff shall submit a proposed judgment consistent with this memorandum order. By that same date, the plaintiff shall either settle the issue of attorneys' fees with the defendants or file a motion and brief (with supporting documentation) for attorneys' fees. Defendants shall respond to any such motion by October 30, 1989.

SO ORDERED.